# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| MCGUIRE BEARING COMPANY, on Behalf of Itself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> JTEKT CORPORATION, KOYO CORPORATION OF U.S.A., NACHI-FUJIKOSHI CORP., NACHI AMERICA INC., NSK LTD., NSK AMERICAS, INC., SCHAEFFLER AG, SCHAEFFLER GROUP USA INC., AB SKF, SKF USA INC., NTN CORPORATION, AND NTN USA CORPORATION, <br><br> Defendants. | No. <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff McGuire Bearing Company, individually and on behalf of a proposed class of direct purchasers of bearings, brings this action for treble damages and injunctive relief against Defendants JTEKT Corporation, Koyo Corp. of U.S.A., Nachi-Fujikoshi Corp., Nachi America, Inc., NSK Ltd., NSK Americas, Inc., Schaeffler AG, Schaeffler Group USA Inc., AB SKF, SKF USA Inc., NTN Corporation, and NTN USA Corporation (collectively "Defendants"), and other currently unnamed co-conspirators under the antitrust laws of the United States and demands a jury trial.

## NATURE OF ACTION

1.      Plaintiff alleges that Defendants participated in a conspiracy to rig bids for, and to fix, stabilize, and maintain the prices of, bearings sold in the United States and elsewhere in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

2.      Bearings are standardized mechanical components that minimize friction between moving parts by removing any possible sliding between bearing surfaces and replacing all contacts with rolling interfaces.  Bearings are critical components in a variety of industries—transportation, industrial manufacturing and energy, space and defense, and electronics and appliances.   The majority of bearings (approximately 55%) are used for purposes other than transportation.

3.      The market for bearings is highly concentrated; Defendants manufacture bearings and control large shares in both the domestic and world-wide market for bearings.

4.      Beginning in at least 2004, Defendants conspired to artificially inflate the prices of bearings sold to direct purchasers of bearings.  Defendants imposed at least five increases in prices since the start of the conspiracy.  In 2010, for example, Defendants agreed to raise the price of bearings sold to industrial machinery manufacturers by 8%-10%.

5.      One Defendant—JTEKT—has admitted to its participation in the conspiracy to artificially inflate prices of bearings while three other Japanese manufacturers—Defendants NTN, NSK, and Nachi—have been charged with violating the Japanese Antimonopoly Act.

6.      International competition authorities have launched an extensive investigation into the bearings industry.  In addition to the Japan Fair Trade Commission's investigation, the Department of Justice has investigated Defendants NTN USA Corporation and Schaeffler.  European Competition authorities have raided Defendants SKF and Schaeffler as well as the European offices of several Japanese Defendants.

7.      Publicly available pricing information for bearings demonstrates that during the Class Period Defendants were able to maintain historically high year-to-year price increases despite flat or falling demand for bearings.

8.      Plaintiff and the Class paid supra-competitive prices for bearings as a result of Defendants' anticompetitive conduct.

9.      Accordingly, Plaintiff McGuire Bearing Company brings this antitrust action on behalf of itself and all others similarly situated who directly purchased bearings from Defendants during the Class Period.  Plaintiff alleges a Class Period beginning in at least January 1, 2004 and continuing through the present.

## JURISDICTION & VENUE

10.      Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries that Plaintiff and the other Class members have suffered as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

11.      This Court has subject matter jurisdiction pursuant to and 28 U.S.C. §§ 1331, 1332(d) and 1337 and 15 U.S.C. §§ 15 and 26.

12.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C § 1391(b), (c) and (d) because during the Class Period, Defendants resided, transacted business, were found, or had agents in this District, and a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District.

13.      This Court has personal jurisdiction over each of the Defendants because each Defendant: transacted business throughout the United States including in this District, had substantial contacts with the United States including in this District, manufactured, sold, shipped, and delivered substantial quantities of bearings throughout the United States, and was engaged in an illegal scheme and price-fixing conspiracy that was directed at and had the intended effect of causing injury to persons and entities residing in, located in, or doing business throughout the United States.

## INTERSTATE TRADE & COMMERCE

14.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

15.     During the Class Period, Defendants manufactured, sold, and shipped substantial quantities of bearings in a continuous and uninterrupted flow of interstate and foreign commerce.

16.     The conspiracy in which the Defendants and their co-conspirators participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## THE PARTIES & CO-CONSPIRATORS

### Plaintiff

17.     Plaintiff McGuire Bearing Company is a privately held corporation that is incorporated and has its principal place of business in the State of Oregon. McGuire Bearing Company purchased bearings directly from one or more Defendants and other manufacturers of bearings during the Class Period.

### Defendants

18.     Defendant JTEKT Corporation ("JTEKT") is a Japanese corporation with its principal place of business in Osaka, Japan. JTEKT directly, or through its wholly owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

19.     Defendant Koyo Corporation of U.S.A. ("Koyo") is a South Carolina corporation with its principal place of business in Westlake, Ohio.  Through its wholly owned and/or controlled subsidiaries, Koyo Corporation of U.S.A. manufactured, marketed, and/or sold bearings that were purchased throughout the United States, including in this District, during the Class Period.  Koyo is a wholly-owned subsidiary of JTEKT Corporation. It specializes in the manufacture and sale of automotive roller and ball bearings. Koyo's headquarters location in

4

Westlake, Ohio also serves as a sales, marketing and distribution center. Koyo's manufacturing facilities are located in Orangeburg, South Carolina; Blythewood, South Carolina; and Washington County, Tennessee. Koyo Bearings USA LLC is a wholly-owned subsidiary of JTEKT Corporation and was formed as a result of JTEKT's acquisition of The Timken Company's Needle Roller Bearings business in 2009. Koyo Bearings USA LLC is headquartered in Canton, Ohio and employs 3,400 personnel worldwide. The company's 2008 sales totaled $621 million. Koyo Bearings USA LLC operates manufacturing facilities in Walhalla, South Carolina; Greenville, South Carolina; Dahlonega, Georgia; Cairo, Georgia; and Sylvania, Georgia. JTEKT's North American sales in 2011 totaled ¥146 billion ($1.762 billion).

20.     Defendant Nachi-Fujikoshi Corp. ("Nachi") is a Japanese corporation with its principal place of business in Toyama, Japan. Nachi directly, or through its wholly owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

21.     Defendant Nachi America Inc. ("Nachi America") is headquartered in Greenwood, Indiana and is the sole authorized U.S. distributor for Nachi-Fujikoshi Corporation. Their manufactured products include bearings. Nachi America operates two sales offices in Miami, Florida and Cerritos, California. Nachi's North American sales in 2011 totaled ¥16 billion ($193 million). Nachi America directly, or through its wholly owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

22.     Defendant NSK Ltd. ("NSK") is a Japanese corporation with its principal place of business in Tokyo, Japan. NSK directly, or through its wholly owned and/or controlled

subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

23.     Defendant NSK Americas, Inc. ("NSK Americas") is headquartered in Ann Arbor, Michigan and oversees the American subsidiaries and affiliates of NSK. Those subsidiaries and affiliates include NSK Corporation, also in Ann Arbor, Michigan, which oversees the manufacture and sales of bearings. NSK's North American sales in FY 2011 totaled ¥86,056,000,000 ($1.039 billion). North American sales of bearings accounted for 12 percent, or ¥26,508,840,000 ($320 million), of NSK's net bearing sales. NSK Americas directly, or through its wholly owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

24.     Defendant Schaeffler AG ("Schaeffler") is a German corporation with its principal place of business in Herzogenaurach, Germany. Schaeffler directly, or through its wholly owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

25.     Defendant Schaeffler Group USA Inc. ("Schaeffler USA") is headquartered in Fort Mill, South Carolina and is responsible for the engineering, production, sales and marketing for the INA, LuK, FAG and Barden brands throughout the United States, Canada, Mexico, Central America and the Caribbean. It operates a 78,000-square-foot facility in Troy, Michigan. The facility employs 165 engineers and technicians. Schaeffler USA also operates manufacturing and sales offices in Danbury, Connecticut; Cheraw, South Carolina; Joplin, Missouri; Spartanburg, South Carolina; Valley City, Ohio; Winsted, Connecticut; and Wooster, Ohio.  In 2011 Schaeffler's North American sales totaled €1,409,000,000 ($1.824 billion) and they employed 6,781 persons in North America. Schaeffler USA directly, or through its wholly

owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

26.     Defendant AB SKF ("SKF") is a Swedish corporation with its principal place of business in Göteborg, Sweden. SKF directly, or through its wholly owned and/or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

27.     Defendant SKF USA Inc. ("SKF USA") is headquartered in Lansdale, Pennsylvania and oversees the SKF distribution, manufacturing and sales locations that operate in the U.S. The SKF North American Technical Center is located in Plymouth, Michigan and includes a 25,650-square-foot testing laboratory for automotive, electrical and industrial bearing applications. The Hub Unit Plant in Aiken County, South Carolina designs and manufactures wheel hub bearing units for SKF. The Spherical Roller Bearing Plant in Hanover, Pennsylvania manufactures spherical roller bearings and traction bearings. The bearing manufacturing facility, located in Gainesville, Georgia, is known as the USA Electrical Division and houses a 150,000-square-foot deep groove ball bearing plant.  SKF USA sales offices can be found in Lansdale, Pennsylvania; San Diego, California; Torrington, Connecticut; and Elgin, Illinois. SKF's North American automotive division sales accounted for 19 percent, or SEK 3,376,490,000 ($490 million), of SKF's net automotive division sales in 2011.  SKF USA directly, or through its wholly owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

28.     Defendant NTN Corporation is a Japanese corporation with its principal place of business in Osaka, Japan. NTN Corporation directly, or through its wholly owned or controlled

subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

29.     Defendant NTN USA Corporation is a Delaware corporation with its principal place of business in Mount Prospect, Illinois. NTN USA Corporation directly, or through its wholly owned or controlled subsidiaries, manufactured, marketed and sold bearings that were purchased throughout the United States, including in this District, during the Class Period.

### Co-Conspirators & Agents

30.     Various other individuals, firms, and corporations not named as Defendants herein have participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy.  Plaintiff reserves the right to subsequently name some or all of these persons as defendants.

31.     Whenever this complaint references any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

### FACTUAL ALLEGATIONS

### BEARINGS—RELEVANT BACKGROUND

32.     Bearings are standardized mechanical components that minimize friction between moving parts by removing any possible sliding between bearing surfaces and replacing all points of contact with rolling interfaces.

33.     Bearings are categorized by their shape; four shapes predominate: ball bearings, tapered roller bearings, cylindrical/needle roller bearings, and spherical roller bearings.  These four sub-groups contain variations predominantly based on size of the bearing.  Many of the

different types of bearings are used by customers in different industries, including the industrial machinery industry, automotive industry and defense and space industries.

34.     Ball bearings and tapered roller bearings are the two most prevalent shapes of bearings used in manufacturing today.

35.     A ball bearing consists of a rolling-element bearing which uses a ball to maintain separation between the moving parts of the bearing.  Ball bearings reduce rotational friction and support radial and axial loads.  Ball bearings are primarily used in manufacturing and transportation.  For example, they are used in mining equipment and as critical components of various wind-energy machinery.  Ball bearings are the largest segment of the bearings industry. In 2007—in the middle of the Class Period—ball bearings consisted of 31.5% of industry revenue, while today they account for 29.9% of industry revenue. Figure 1 presents ball bearings.

**Figure 1.  Ball Bearings**



36.     Tapered roller bearings run conical rollers along conical races.  Typically, tapered roller bearings support radial loads but in certain circumstances tapered roller bearings can support both radial and axial loads.  Tapered roller bearings are principally used as wheel bearings in cars, trucks and buses.  Tapered roller bearings are the second-largest product

segment in the bearings industry and, as of 2012, accounted for 29.8% of industry revenue. Figure 2 presents a tapered roller bearing.

### Figure 2.  Tapered roller Bearings



37.     Bearings are primarily purchased by companies involved in five major industries including (1) transportation, (2) industrial manufacturing and energy, (3) space and defense, (4) electronics and appliances, and (5) miscellaneous.  Companies in these industries include the original equipment manufacturers as well as organizations that purchase bearings to maintain and repair equipment.  Figure 3 below demonstrates the market segmentation for bearings sales in 2012 with transportation manufacturers (45%), industrial equipment and energy (25%), defense and space (10%), electronics and appliance manufacturers (10%) and other (10%).

**Figure 3.  Bearings Sales: Major Market Segmentation**



38.    The size of the bearings industry in terms of revenue is $30 billion world-wide; United States revenue from bearings was $8.5 billion last year with bearings manufacturers enjoying a profit of $763.5 million dollars in 2011 alone.

39.    The bearings industry is a net importer with approximately 40% of imports coming from Japan, China, and Korea.  The United States also exports bearings; Canada and Mexico are the major buyers of US bearings exports due to their geographic proximity to the Untied States and the advantages of the North American Free Trade Agreement.

40.    Defendants and their co-conspirators supplied direct purchasers of bearings in the industrial machinery, automotive, defense and space and other manufacturing industries in the United States and elsewhere.  Additionally, Defendants and their co-conspirators manufactured and sold bearings to replacement parts manufacturers.

41.    Defendants and their co-conspirators manufactured bearings (a) in the United States for installation in equipment and vehicles manufactured and sold in the Untied States, and (b) abroad for export to the United States and installation in equipment and vehicles manufactured and sold in the Untied States.

11

42.     Plaintiff and members of the proposed Class purchased bearings directly from one or more of the Defendants.

## THE BEARINGS MARKET WAS CONDUCIVE TO CONSPIRACY

43.     The structure and characteristics of the market for bearings are particularly conducive to a price-fixing agreement and have made collusion particularly attractive in this market.  These factors are discussed below.

### Industry Concentration

44.     A high degree of concentration facilitates coordination among co-conspirators. The fewer competitors in a market, the easier it is for those competitors to collude.

45.     Both the domestic and international markets for bearings are highly concentrated oligopolies in which Defendants control the vast majority of the market.

46.     According to one recent source, Defendants controlled more than 60% of the world market for bearings in 2011 with Defendant SKF enjoying an 18% share, Defendant Schaeffler controlling 16% of the market, NSK exhibiting an 11% market share, and Defendants NTN and JTEKT/Koyo demonstrating 10% and 8% international market share numbers respectively.

47.     The domestic market for bearings is also highly concentrated.

48.     In 2011, Defendant SKF controlled 23.3% of the domestic market for bearings. SKF has routinely had over $1 billion in sales of bearings to the United States every year throughout the Class Period.

49.     Also as of 2011, Defendant NSK Ltd. controlled 13.2% of the market share for bearings in the United States.  Every year during the Class Period, NSK sold hundreds of millions of dollars worth of bearings to the Untied States.  In 2011, NSK sold over $1 billion of bearings and had a net income of $43.3 million.

50.     Defendant NTN reported U.S. sales of $1.2 billion in 2011 and throughout the Class Period sold hundreds of millions of dollars worth of bearings in North America.  For the last five years, JTEKT has sold more than a billion dollars worth of bearings in North America.  In recent years Schaeffler has also reported sales topping $1 billion in North America.  Given that the total United States market was $8.5 billion in 2011, it is clear that Defendants control the vast majority of the market - rendering it conducive to conspiracy.

### Commodity Products

51.     A commodity-like product is one that is standardized across suppliers and allows for a high degree of substitutability among different suppliers in the market.  When products offered by different suppliers are viewed as interchangeable by purchasers, it is easier for the suppliers both to agree on prices for the product and to monitor theses prices.

52.     Bearings are homogeneous, commodity products.  One Defendant's bearing can easily be substituted for the corresponding size and shape of bearing manufactured by another Defendant.

53.     Indeed, as part of Defendants' membership in its trade association—the World Bearings Association—Defendants participate in a standards-setting sub-organization through the American Bearings Manufacturing Association's ("ABMA") Bearing Technical Committee, the principal purpose of which is to ensure that bearings are standardized within shape and size.  Standards set by the Bearing Technical Committee are reviewed by a technical Advisory Group made up of bearing manufacturers, end users, and other interested parties.  According to the ABMA's website, "All standards have received the approval of participating companies as well as the American National Standards Institute (ANSI) and/or the International Standards Organization (ISO)."  Defendants have gone so far as to compile a website,

www.stopfakebearings.com, to educate purchasers about fake bearings that do not comply with the standards set by the ABMA's Bearing Technical Committee.

54.     Moreover, the pace of product development in the market for bearings has slowed significantly.  Thus, competition is no longer concentrated on manufacturers' ability to differentiate itself by offering new functionality in the market.

55.     Because these products are standardized in terms of design and function, pricing serves as the primary means of achieving product differentiation rendering the market for bearings susceptible to price-fixing.

### Price Elasticity

56.     Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.  Inelastic demand is another indicator that a price-fixing conspiracy would be successful.

57.     Bearings are critical components to the successful manufacturing of products in several key industries including the automotive industry, industrial manufacturing and energy industry, defense and space industries, and electronics industry.  There are no viable substitutes for these vital products and therefore pricing for bearings is highly inelastic and susceptible to collusion.

### High Barriers to Entry

58.     The presence of significant entry barriers to potential competitors that could otherwise cause the incumbents to reduce their prices helps facilitate coordination among co-conspirators.

59.     The market for bearings is characterized by high entry barriers.

14

60.     Significant financial resources of tens of millions of dollars are necessary to acquire and maintain critical infrastructure such as plants, equipment, transportation capabilities, electricity and other energy components, and distribution infrastructure.

61.     Moreover, incumbent manufacturers of bearings—particularly those servicing manufacturing industries—have long-standing relationships with both upstream suppliers and downstream markets, making it difficult for firms to break in and serving as a deterrent to new market entrants.

**Opportunities for Collusion**

62.     Defendants participated in various industry events that provided opportunities to regularly get together and meet privately.

63.     For example, Defendants are members of the World Bearing Association ("WBA").  The World Bearing Association was formed during the conspiracy in 2006 when the American Bearing Manufacturers Association, the Japanese Bearing Industrial Association and the European Bearing Manufacturers Association merged.  Unlike other bearings trade associations, the WBA lists as its membership *only* seven entities—the seven largest bearings manufacturers in the world—including FAG (owned by Defendant Schaeffler), Defendant Koyo (owned by Defendant JTEKT), Defendant Nachi, Defendant NSK, Defendant NTN, Defendant SKF, and Timken.  Because smaller bearings manufacturers or other interested industry participants were not invited to join, the WBA is designed to provide an even more convenient opportunity for the largest bearings manufacturers to meet and discuss their scheme.

64.     Defendants are also members of the American Bearings Manufacturers Association within the WBA.  The ABMA holds numerous events which provide opportunities for Defendants to conspire.  For example, the ABMA hosts two annual events—its annual

meeting and fall meeting—that provide an opportunity for conspirators to get together and meet privately.   Last year the ABMA's annual meeting was held in April in San Antonio, Texas and the fall meeting occurred in October in Arlington, Virginia.

65.      Indeed, senior executives from Defendants run the ABMA section of the WBA. Pete Eich, President of NTN Corporation, serves as the Chair of the association and Brian Lindsay, CEO of NSK Corporation of America serves as the Vice Chair.   Other executives from Defendants serve on the ABMA Board of Directors including: Paul Beargie, Director of Corporate Operations at Koyo Corporation, Poul Jeppesen, President & CEO of SKF USA, Inc., Daniel Nebesio, Vice Present of Operations of Nachi Technology, Inc. and Bruce Warmbold, Present of The Schaeffler Group.

## DEFENDANTS CONSPIRE TO INCREASE PRICES OF BEARINGS

66.      Defendants and their co-conspirators conspired to increase prices of bearings from 2004 through the present.

67.      Defendants have imposed at least five price increases since 2004 as part of their conspiracy.

68.      The Producer Price Index ("PPI") measures the price change over time for fixed set of goods and services and is targeted to the marketed output of U.S. producers.   One of the items tracked under the PPI is bearings.   Focusing specifically on the percentage increase in prices from year to year in bearings, it is clear that Defendants were able to impose and maintain significantly higher price increases after the start of the conspiracy.   Figure 4 below demonstrates this phenomenon.

**Figure 4. Average Percentage Price Increase for Bearings According to PPI**



69.     Notably, this chart likely *underestimates* the effect of Defendants' conspiratorial price increases because this chart includes pricing from fringe non-conspirators.

70.     Defendants effectuated their conspiracy by conducting meetings at which they would agree to set prices for bearings at supra-competitive levels.

71.     For example, representatives from Defendants JTKET, NTN, NSK, and Nachi-Fujikoshi met several times between late May 2010 and late August 2010, in and around Tokyo. At these meetings they agreed to raise the price of bearings sold to industrial machinery companies after July 2010 by 8% for general bearings and 10% for larger size bearings.

72.     Two representatives from NTN, NSK, and Nachi-Fujikoshi also met between late May 2010 and late August 2010, in and around Tokyo, Japan, and agreed to raise the sale price of bearings sold to automobile manufacturers.

### PLAINTIFF AND THE CLASS SUFFERED ANTITRUST INJURY

73.     As a result of Defendants' illegal and anticompetitive scheme, Plaintiff and other purchasers of bearings suffered antitrust injuries.

74.     Defendants' conspiratorial scheme had the result of restraining, suppressing, or eliminating price competition for bearings.

75.     Moreover, Defendants' anticompetitive conduct has had the following effects:

(a)     the prices of bearings have been raised, fixed, maintained, or stabilized at supra-competitive levels;

(b)     price competition has been restrained, suppressed, or eliminated with respect to bearings; and

(c)     purchasers of bearings have been deprived of free and open competition in the bearings market.

76.     As a result of the contract, combination, or conspiracy, Plaintiff and Class members paid anticompetitive prices for bearings, and Plaintiff and Class members have sustained injury to their business or property.

### INTERNATIONAL COMPETITION AUTHORITIES LAUNCH AN INVESTIGATION INTO THE BEARINGS INDUSTRY

77.     In late 2011, competition authorities in the United States, Europe, and Japan launched a coordinated investigation into possible cartel activity within the bearings market.

78.     The Japanese Fair Trade Commission ("JFTC") has focused its investigation on the four Japanese manufacturers of bearings: Defendants JTEKT, NSK, Nachi, and NTN.  As

part of its investigation into these Defendants' anticompetitive activities, the JFTC has searched at least twenty related locations including their principal places of business as well as their executives' homes.

79.     Defendant NSK has acknowledged that, "in July 2011 the Japan Fair Trade Commission conducted on-site investigations of NSK on suspicion that sales of certain products infringed upon Japan's Antimonopoly Act . . . ."

80.     Likewise, NTN's 2011 Financial Report contained the following statement, "in July 2011, the Company underwent an on-site inspection by the Japan Fair Trade Commission into domestic transactions on bearings, on suspicion that the Company had decided to raise sale prices in cooperation with other manufacturers, and in April this year a search was carried out by special investigators from Tokyo District Public Prosecutor's Office and the Fair Trade Commission."

81.     The JFTC launched its investigation in July 2011 after Defendant JTEKT alerted the JFTC of the cartel's existence and sought leniency.  Japan's leniency program grants full immunity from prosecution to the business if they admit their participation in the cartel and provide the JFTC with the relevant information detailing the anticompetitive violation.

82.     As a result of these raids and its investigation, on June 14, 2012, the JFTC filed a criminal accusation against Defendants NSK, Nachi and NTN as well as seven executives from those companies.  The criminal accusation charged these companies and individuals with having participated in a price-fixing cartel involving industrial machinery bearings and automotive bearings in violation of Article 74(1) of the Antimonopoly Act.

83.     A report in The Japan Times notes that some NTN corporation officials have begun to make statements to Tokyo prosecutors concerning their price-fixing.  Another report

notes that NTN, NSK, and Nachi-Fujikoshi have raised bearing prices five times since 2004 and states that the JFTC believes that these price increases were also the product of the cartel.

84.     The Japanese Defendants, as well as European manufacturers SKF and Schaeffler, have also been targeted by investigators within Europe and the United States.

85.     NSK has publically acknowledged that its German unit was the target of the European Commission's investigation into suspected price fixing.  Likewise, NTN's 2011 Financial Report stated that both its France and German operations were targeted by the European Commission as part of its investigation into cartel activity in the bearings industry. NTN stated: "In November 2011, our European consolidated subsidiaries also received an on-site inspection by the European Commission into transactions in bearings, on suspicion of noncompliance with the EU Competition Law.  Furthermore, in November 2011 our United States consolidated subsidiary received a subpoena from the United States Department of Justice requesting the submission of information related to transactions in bearings."

86.     In Schaeffler's 2011 Annual Report, it acknowledged that "[t]he European Commission as well as the US Department of Justice have commenced antitrust investigations of various manufacturers of rolling bearings, including Schaeffler.  The European and the U.S. competition authorities are investigating whether manufacturers of rolling bearings participated in unlawful agreements and/or concerted practices concerning rolling or plain bearings."

87.     Likewise, SKF's 2011 annual report contained a similar admission that it and "other companies in the bearings industry became part of an investigation by the European Commission regarding a possible violation of EU antitrust laws."  In a separate statement, SKF admitted the European competition authorities visited its facilities in Gothenburg, Sweden, and Schweinfurt, Germany.

20

88.     Defendants are no stranger to anticompetitive conduct.  A 1973 JFTC investigation discovered evidence that NTN Toyo Bearings Co., NSK, Koyo Seiko Co. (currently JTEKT), and Nachi had participated in a price-fixing conspiracy for bearings.  Sales executives from these companies were found to have held secret meetings at which they fixed prices for bearings.

89.     Defendants SKF, Schaeffler, and NSK were fined by the French Competition Authority in 2002 after a French investigation found that between 1993 and 1997 these companies had conducted a price-fixing conspiracy that caused a cumulative increase in gross industry prices of bearings of 16.4%.  French authorities fined the companies €19 million.

## FRAUDULENT CONCEALMENT

90.     Plaintiff and members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 2011, when international authorities' raids of Defendants were first made public.

91.     Because Defendants' conspiracy was kept secret until July 2011, Plaintiff and members of the Class were unaware before that time of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for bearings during the Class Period.

92.     The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

93.     By its very nature, Defendants' conspiracy was inherently self-concealing. Bearings are not exempt from antitrust regulation, and thus, prior to the official launch of

criminal investigations, Plaintiffs reasonably considered the bearings market to be a well-regulated and competitive industry.

94.     Moreover, Defendants represented publicly, both to customers and otherwise, that their pricing and bidding activities were competitive.  In so representing, Defendants affirmatively concealed to Plaintiff and the Class the fact of their anticompetitive scheme.

95.     In the exercise of due diligence, and as part of its regular business practice, Plaintiff, through its purchasing department, was constantly researching suppliers and looking for alternative sources of supply for its parts, including bearings.

96.     Plaintiff exercised due diligence in researching and comparing prices of bearings to ascertain whether it was being offered competitive prices for such products.

97.     Under the circumstances surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' bidding and pricing of bearings until July 2011.

98.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiffs and members of the Class had no knowledge of the alleged conspiracy, or any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until the fact of the criminal investigations were made public.

99.     None of the facts or information available to Plaintiffs and members of the Class prior to July 2011, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein.

100.    As a result of Defendants' fraudulent concealment of their conspiracy, any statute of limitations has been tolled with respect to any claims that Plaintiffs and members of the Class have alleged in this Complaint.

### CLASS ACTION ALLEGATIONS

101.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), Plaintiff brings this action on behalf of itself and as the representative of a Class defined as follows:

> All persons and entities in the United States who purchased bearings directly from any Defendant at any time from at least as early as January 1, 2004 through the present ("Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries, and affiliates, any co-conspirators, federal governmental entities, and instrumentalities of the federal government.

102.    Plaintiff believes that there are more than a hundred Class members located throughout the United States, the exact number and their identities being known by Defendants, making the Class so numerous and geographically dispersed that joinder of all members is impracticable.

103.    Defendants have acted on grounds generally applicable to the entire Class. Accordingly, questions of law and fact common to the Class predominate over questions, if any, that may affect only individual Class members.

104.    Questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants contracted, combined, or conspired to fix, raise, maintain, or stabilize prices, or to rig bids for, bearings sold in the United States;

(b)    The identity of the conspiracy's participants;

(c)    The duration of the conspiracy alleged in the Complaint and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

(e)      Whether the contract, combination, or conspiracy caused bearings prices to be higher than they would have been in the absence of Defendants' conduct;

(f)      Whether the conduct of the Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the other Class members;

(g)      The effect of the conspiracy on the prices of bearings sold in the United States during the Class Period; and

(h)      The appropriate Class-wide measure of damages.

105.    Plaintiff's claims are typical of the claims of Class members, and Plaintiff will fairly and adequately protect the interests of the Class.  Plaintiff and all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the antitrust laws in that they paid artificially inflated prices for products purchased directly from Defendants or their co-conspirators.  Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other Class members.   Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

106.    Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

107.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

108.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

109.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender.  This action presents no difficulties in management that would preclude maintenance as a class action.

## CAUSE OF ACTION

### VIOLATION OF SECTION 1 OF THE SHERMAN ACT – 15 U.S.C. § 1

110.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

111.     Beginning at least as early as January 1, 2004, and continuing thereafter, Defendants and their co-conspirators, by and through their officers, directors, employees, agents, or other representatives, entered into a continuing agreement, understanding, and conspiracy to rig bids for, and fix prices of bearings in violation of Section 1 of the Sherman Act.

112.     This alleged conspiracy amounted to a per se violation of the Sherman Act.

113.     Plaintiff and the other Class members have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiff and Class members have paid more for bearings than they otherwise would have paid in the absence of Defendants' conduct.  This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

114.    Defendants and their co-conspirators' anti-competitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for bearings throughout the United States.

115.    Accordingly, Plaintiff and Class members seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## DEMAND FOR A JURY TRIAL

116.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and Rule 23(b)(3) of the Federal Rules of Civil Procedure.

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

C.    That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law.

D.    That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law.

E.    That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law.

F.    That Defendants be enjoined from continuing their participation in the alleged conspiracy.

G.    For such other and further relief as is just and proper under the circumstances.

Dated: July 3, 2012                          Respectfully submitted,

/s/CHARLOTTE CROSON_____
Charlotte Croson (P56589)
Law Offices of Kathleen L. Bogas, PLLC
31700 Telegraph Road
Suite 160
Bingham Farms, MI 48025
Tel: 248-502-5000
Fax: 248-502-5001
ccroson@kbogaslaw.com

Kit A. Pierson
Brent W. Johnson
Meghan M. Boone
Cohen Milstein Sellers & Toll PLLC
1100 New York Ave., NW
Suite 500 West
Washington, DC 20005
Tel: 202-408-4600
Fax: 202-408-4699
kpierson@cohenmilstein.com
bjohnson@cohenmilstein.com
mboone@cohenmilstein.com

M. John Dominguez
Cohen Milstein Sellers & Toll PLLC
3507 Kyoto Gardens Drive
Suite 200
Palm Beach Gardens, FL 33410
Tel: 561-578-6850
jdominguez@cohenmilstein.com

Solomon B. Cera
Gold Bennett Cera & Sidener LLP
595 Market Street
Suite 2300
San Francisco, CA 94105
Tel: 415-777-2230
Fax: 415-777-5189
scera@gbcslaw.com

*Counsel for Plaintiff McGuire Bearing Company
and the Proposed Class*